**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

———————————————————————x
                            :
JIANGSU DINGSHENG NEW MATERIALS  :
JOINT-STOCK CO., LTD., *et al.*,       :
                            :
          Plaintiffs,        :
                            :
      v.                      :
                            :       Court No. 24-00228
UNITED STATES,              :
                            :
         Defendant,       :
                            :
      and                   :
                            :
ALUMINUM ASSOCIATION TRADE     :
ENFORCEMENT WORKING GROUP AND ITS :
INDIVIDUAL MEMBERS, *et al.,*     :
                            :
       Defendant-Intervenors.  :
———————————————————————x

**<u>PLAINTIFFS' MOTION FOR JUDGMENT</u>**
**<u>ON THE AGENCY RECORD PURSUANT TO RULE 56.2</u>**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Jiangsu Dingsheng New

Materials Joint-Stock Co., Ltd.; Dingsheng Aluminium Industries (Hong Kong) Trading Co.,

Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.); Hangzhou

Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.);

Hangzhou Five Star Aluminium Co., Ltd.; Hangzhou Teemful Aluminium Co., Ltd.; Inner

Mongolia Liansheng New Energy Material Co., Ltd.; Inner Mongolia Xinxing New Energy

Material Co., Ltd. (Inner Mongolia Xinxing New Material Co.); Dingheng New Materials Co.,

Ltd.; and Prosvic Sales Inc. (collectively, "Dingsheng") respectfully move for judgment on the

agency record. Plaintiffs challenge certain aspects of the U.S. Department of Commerce's

("Commerce") final results in the antidumping duty administrative review published as *Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Rescission of Review, in Part; 2022-2023*, 89 Fed. Reg. 88,972 (Nov. 12, 2024).

Plaintiffs request that the Court remand this matter to Commerce with instructions consistent with this Court's decision. The legal arguments in support of this motion are detailed in the attached Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Agency Record.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

*Counsel for Plaintiffs*

Dated: October 8, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| _____x | |
| : | |
| JIANGSU DINGSHENG NEW MATERIALS : | |
| JOINT-STOCK CO., LTD., *et al.*, : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | Court No. 24-00228 |
| : | |
| UNITED STATES, : | **PUBLIC VERSION** |
| : | |
| Defendant, : | |
| : | |
| and : | |
| : | |
| ALUMINUM ASSOCIATION TRADE : | |
| ENFORCEMENT WORKING GROUP AND ITS : | |
| INDIVIDUAL MEMBERS, *et al.,* : | |
| : | |
| Defendant-Intervenors. : | |
| _____x | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022

*Counsel for Plaintiffs*

Dated: October 8, 2025

## <u>TABLE OF CONTENTS</u>

**STATEMENT PURSUANT TO USCIT RULE 56.2**..................................................... **1**

I.    ADMINISTRATIVE DETERMINATION SUBJECT TO APPEAL............................... 1

II.    ISSUES OF LAW & ARGUMENT SUMMARY ............................................... 1

III.    REASONS FOR CONTESTING THE DETERMINATION............................................ 3

**STANDARD OF REVIEW** ............................................................................... **3**

**STATEMENT OF FACTS** ............................................................................... **5**

I.    THE ADD ORDER ON ALUMINUM FOIL FROM CHINA AND AR4 ...................... 5

II.    AR5 INITIATION THROUGH *PRELIMINARY RESULTS* ............................................ 6

III.    AR5 BRIEFING THROUGH THIS APPEAL ................................................... 13

**ARGUMENT** ..................................................................................................... **16**

I.    COMMERCE UNLAWFULLY VALUED DINGSHENG'S RECYCLED ALUMINUM BY-PRODUCT ............................................................................................ 16

    A.  Dingsheng Directly Reintroduced a Predominant Portion of Its By-Product RECYCLEDAL as a Production Input ................................................... 16

    B.  Aluminum Industry Information Corroborates Dingsheng's Direct Re-Introduction of Recycled Aluminum By-Product as an Input for Production ...................................... 18

    C.  Company-specific Information Corroborates Dingsheng's Position That RECYCLEDAL and SELFPRORYAL Should be Valued in the Same Manner ....... 23

    D.  Commerce's Longstanding Practice is To Value RECYCLEDAL by Averaging HTS 7601.10 and 7601.20 ................................................................... 26

    E.  *Zhongji* supports valuing RECYCLEDAL at an average of HTS 7601.10 and 7601.20 ................................................................................... 27

    F.  Substantial Evidence Contradicts Commerce's Justification for Relying on HTS 7602.00 to Value the Entire RECYCLEDAL ............................................. 31

II.    COMMERCE'S FAILURE TO GRANT ALL DINGSHENG COMPANIES A SEPARATE RATE WAS CONTARY TO LAW .................................................. 32

    A.  Commerce Unlawfully Found That Its Separate Rate Grant to Only Certain AR5 Dingsheng Entities Was Not a Ministerial Error ........................................ 32

    B.  Commerce Unlawfully Declined to Correct its Erroneous Separate Rate Identification ......................................................................................... 34

**CONCLUSION** ..................................................................................................... **38**

i

# TABLE OF AUTHORTIES

**Cases**

*American Truck Ass'n v. Frisco*, 358 U.S. 133 (1958)................................................ 34
*British Steel PLC v. United States*, 127 F.3d 1471 (Fed. Cir. 1997) ........................... 4
*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)........................ 4
*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................... 3
*Consolidated Fibers, Inc. v. United States*, 32 CIT 24 (2008) ............................... 5, 37
*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................... 5
*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ...................... 3, 34
*Jiangsu Zhongji Lamination Materials Co. v. United States*, 396 F. Supp. 3d 134 (CIT 2019) …..
................................................................................................................ ….. *passim*
*Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024) ............................................... 3
*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984).............. 3
*Maui Pineapple Co. v. United States*, 27 CIT 580 (2003) .......................................... 36
*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272 (2008) ....................... 5
*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995)................... *passim*
*Queen's Flowers de Colom. v. United States*, 21 CIT 968 (1997) .............................. 29
*Rhone Poulenc Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)................... 35, 36
*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004). .................. 4
*Shinhan Diamond Indus. Co. v. United States*, 34 CIT 227 (2010)....................... 33, 34
*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).......................... 4, 38
*SKF USA Inc., v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)........................... 4, 27
*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005)....................... 5, 37
*Torrington Co. v. United States*, 21 CIT 1079 (1997) ................................................ 36
*Trs. In Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290 (2007)..
............................................................................................................................... 4
*Trs. In Bankruptcy of N. Am. Rubber Thread Co. v. United States*, 558 F. Supp. 2d 1367 (2008)..
............................................................................................................................... 4
*Tung Mung Dev. Co. v. United States*, 25 CIT 752 (2001).......................................... 30
*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ....................................... 3, 34
*WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340 (CIT 2012) ................... 4

**Statutes**

5 U.S.C. § 706 ............................................................................................................. 5
19 U.S.C. § 1516a ...................................................................................................... 3
19 U.S.C. § 1675 ................................................................................................. 32, 34
28 U.S.C. § 2637 ........................................................................................................ 36

**Regulations**

19 C.F.R. § 351.224 ......................................................................................... 32, 35, 37

**Administrative Decisions & Publications**

*Certain Aluminum Foil From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination,* 82 Fed. Reg. 50,858 (Nov. 2, 2017)........................................................................ 26
*Certain Aluminum Foil from the People's Republic of China: Final Determination of Sales at Less-Than-Fair Value*, 83 Fed. Reg. 9,282 (Mar. 5, 2018) ..................................... 26

*Certain Aluminum Foil from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg. 17,362 (Apr. 19, 2018)… ……………………………………………………………………*passim*

*Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (June 24, 2020) .................................... 26

*Certain Aluminum Foil from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 2017-2019*, 86 Fed. Reg. 17,358 (Apr. 2, 2021) .. 26

*Certain Aluminum Foil From People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2021–2022*, 88 Fed. Reg. 29,092 (May 5, 2023)........................................................................................................ 5, 11, 32

*Certain Aluminum Foil from People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021–2022*, 88 Fed. Reg. 76,734 (Nov. 7, 2023).......................................................................................... 4

*Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments: 2022-2023*, 89 Fed. Reg. 35,801 (May 2, 2024) ........................................................................ 11, 12, 32

*Certain Aluminum Foil from People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Rescission of Review, in Part; 2022-2023*, 89 Fed. Reg. 88,972 (Nov. 12, 2024).................................................. *passim*

*Common Alloy Aluminum Sheet from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 54,975 (Sept. 8, 2022)… ......................................................................................................................... 25

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 38,021 (June 12, 2023)......................................................................................................... 5

This Memorandum is filed by Plaintiffs Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd.; Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.); Hangzhou Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.); Hangzhou Five Star Aluminium Co., Ltd.; Hangzhou Teemful Aluminium Co., Ltd.; Inner Mongolia Liansheng New Energy Material Co., Ltd.; Inner Mongolia Xinxing New Energy Material Co., Ltd. (Inner Mongolia Xinxing New Material Co.); Dingheng New Materials Co., Ltd.; and Prosvic Sales Inc. (collectively, "Dingsheng") to support their Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO USCIT RULE 56.2

### I.    ADMINISTRATIVE DETERMINATION SUBJECT TO APPEAL

Dingsheng appeals the U.S. Department of Commerce's ("Commerce" or the "Department") final results in the fifth administrative review ("AR5") of the antidumping duty ("ADD") order on Aluminum Foil from the People's Republic of China ("China"), for the period of review ("POR") April 1, 2022, through March 31, 2023. *Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Rescission of Review, in Part; 2022-2023*, 89 Fed. Reg. 88,972 (Nov. 12, 2024), P.R. 413 ("*Final Results*"), accompanying Issues and Decision Memorandum, P.R. 404 ("IDM").

### II.    ISSUES OF LAW & ARGUMENT SUMMARY

1. Commerce unlawfully valued Dingsheng's RECYCLEDAL (by-product recycled aluminum) using Harmonized Tariff Schedule ("HTS") subheading 7602.00 data ("aluminum waste and scrap"). The record confirms that RECYCLEDAL is identical to, and fungible with, Dingsheng's self-produced recycled aluminum (SELFPRORYAL). To lawfully calculate

1

Dingsheng's ADD rate, RECYCLEDAL and SELFPRORYAL must be valued in the same manner. Dingsheng's RECYCLEDAL was generated by a closed-loop process followed by its direct reintroduction (without any pretreatment), confirming that SELFPRORYAL and RECYCLEDAL describe the same material that has identical physical and chemical properties. Industry-wide and company-specific information corroborates Dingsheng's position that RECYCLEDAL should be valued using the same HTS data as SELFPRORYAL. Commerce should have followed its longstanding practice to value RECYCLEDAL by averaging HTS subheadings 7601.10 and 7601.20 data ("unwrought aluminum"), as it had done in the investigation. Finally, Commerce's justification for relying on HTS 7602.00 data to value Dingsheng's entire RECYCLEDAL is premised on incorrect data and a flawed interpretation of relevant judicial precedent.

2.  Commerce unlawfully failed to grant all Dingsheng entities in AR5 a separate rate. In copying and pasting its decision from the preceding review to identify the Dingsheng entities eligible for a separate rate in AR5, Commerce committed a ministerial error. Dingsheng brought this error to Commerce's attention in timely-filed ministerial error comments, but Commerce incorrectly concluded that its copy/paste decision was not a clerical error. Moreover, Commerce unlawfully declined to correct its erroneous separate rate identification given its authority and obligation to correct errors which result in the draconian assignment of an inaccurate ADD rate. In this case, Commerce's error resulted in applying the China-wide adverse facts available rate to Dingsheng entities who participated in AR5 but who had not participated in AR4. The arbitrariness of this Commerce decision contrasts with its decision to self-correct its less egregious clerical error concerning cash deposit instructions that was likewise timely raised.

III.    **REASONS FOR CONTESTING THE DETERMINATION**

Dingsheng's reasons for contesting the *Final Results* are set forth below.

<u>**STANDARD OF REVIEW**</u>

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). The substantial evidence standard requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The Supreme Court recently overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), which had directed courts to defer to reasonable interpretations of ambiguous statutes by administrative agencies. *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 369-70, (2024) ("Courts need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous."). *Loper* underscores the "solemn duty of the Judiciary" to interpret statutes and "say what the law is." *Id*. at 385 (internal quotations omitted). Further, *Loper* forecloses this Court from affirming the Commission's decision merely upon finding that the government's statutory interpretations is "reasonable," and for that reason alone, "must" affirm. *Id*. at 395, 400. *Loper* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the

court, after applying all relevant interpretive tools, concludes is best. **In the business of statutory interpretation, if it is not the best, it is not permissible**." *Id.* (emphasis added).

Despite Commerce's statutory discretion, . . . if Commerce had a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("*SKF I*"). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ("*SKF II*"). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF I*, 263 F.3d at 1382.

"If the Department provides no reasonable explanation for changing a practice that it has consistently followed, such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F. Supp. 2d 1340, 1344 (CIT 2012). As articulated by this Court:

> Commerce has "discretion to change its policies and practices as long as they are reasonable and consistent with their statutory mandate {and} may adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record." *Trs. In Bankruptcy of N. Am. Rubber Thread Co. v. United States*, . . . , 533 F. Supp. 2d 1290, 1297 (2007). Accordingly, when departing from its own precedent, Commerce must explain its departure. *See id.* ("Commerce {must} attempt to distinguish the reasoning set forth in {prior cases} from the present case"); *Trs. In Bankruptcy of N. Am. Rubber Thread Co. v. United States*, . . . , 558 F. Supp. 2d 1367, 1370 (2008) ("Generally, 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'"); *Consol. Bearings Co. v. United States,* 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow{s} a contrary practice in similar circumstances and provide{s} no reasonable explanation for the change in practice."); *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why.").

4

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1276-77 (2008); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy.").

Finally, this Court will "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "{T}he touchstone of the arbitrary capricious standard is rationality." *Consolidated Fibers, Inc. v. United States*, 32 CIT 24, 36 (2008) (internal quotations omitted). "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

## STATEMENT OF FACTS

## I.    THE ADD ORDER ON ALUMINUM FOIL FROM CHINA AND AR4

In April 2018, Commerce issued an ADD order on aluminum foil from China. *Certain Aluminum Foil from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg. 17,362 (Apr. 19, 2018) ("*Aluminum Foil ADD Order*"). Dingsheng and Jiangsu Zhongji Lamination Materials Co., (HK) Ltd. ("Zhongji") were individually examined by Commerce in the less than fair value ("LTFV") investigation, as the two mandatory respondents. *Id*. at 17,363. Dingsheng was individually examined in subsequent reviews of the *ADD Order*, including the fourth administrative review ("AR4"), when it was the only mandatory respondent. *Aluminum Foil from People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No*

*Shipments; 2021–2022*, 88 Fed. Reg. 76,734, 76,735 (Nov. 7, 2023) ("*AR4 Final Results*"). In

AR4, the Department preliminarily recognized that six Dingsheng affiliated entities should be

collapsed as a single entity:

> Consistent with Commerce's treatment of {1} Dingsheng Aluminium Industries
> (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong
> Kong) Trading Co., Ltd.); {2} Hangzhou Dingsheng Import&Export Co., Ltd.
> (Hangzhou Dingsheng Import and Export Co., Ltd.); {3} Hangzhou Five Star
> Aluminium Co., Ltd.; {4} Hangzhou Teemful Aluminium Co., Ltd.; {5} Inner
> Mongolia Liansheng New Energy Material Co.; and {6} Inner Mongolia Xinxing
> New Energy Material Co., Ltd. (collectively, Dingsheng) in a prior segment of
> this proceeding, we have continued to find that these companies are affiliated
> entities, pursuant to sections 771(33)(E), (F), and (G) of the Act, and that they
> should be treated as a single entity pursuant to 19 CFR 351.401 (f)(1)–(2).

*Certain Aluminum Foil from People's Republic of China: Preliminary Results of Antidumping*

*Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and*

*Preliminary Determination of No Shipments; 2021–2022*, 88 Fed. Reg. 29,092, 29,093 (May 5,

2023) ("*AR4 Preliminary Results*").

Further, in AR4 Commerce found that these affiliated, collapsed Dingsheng entities

qualified for an ADD rate "separate" from that of the China-wide entity. *Id.* These collapsed

Dingsheng entities were collectively assigned a calculated 32.85% preliminary ADD rate in

AR4, instead of the 105.80% China-wide rate. *Id.* at 29,093-94. In the *AR4 Final Results*,

Commerce finalized its assignment of a calculated, separate ADD rate for the affiliated and

collapsed Dingsheng entities. 88 Fed. Reg. at 76,735.

## II.    AR5 INITIATION THROUGH *PRELIMINARY RESULTS*

In June 2023, Commerce initiated AR5 of the *Aluminum Foil ADD Order* with respect to

multiple companies, including Dingsheng. *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 88 Fed. Reg. 38,021, 38,026 (June 12, 2023), P.R. 100. In July 2023,

Dingsheng filed its Separate Rate Application ("SRA"), in which it made the requisite

attestations and provided the necessary documentation to establish an absence of both *de jure* and *de facto* government control, and, accordingly, its eligibility for a separate rate. Dingsheng SRA (July 31, 2023), C.R. 14-28, P.R. 88-96, at 1. In August 2023, Commerce selected Dingsheng and Zhongji as the mandatory respondents for AR5. Commerce Respondent Selection Memorandum (Aug. 2, 2023), C.R. 31, P.R. 99, at 6.

Dingsheng fully participated in AR5 by submitting extensive factual information in its questionnaire responses and surrogate value ("SV") submissions. *See e.g.*, Dingsheng Section A Questionnaire Response (Sept. 13, 2022), C.R. 70-90, P.R. 126-31 ("AQR"); Dingsheng First SV Submission (Jan. 3, 2024), P.R. 167-84. In September 2023, Dingsheng filed its AQR on behalf of ten separate Dingsheng entities:

1. Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. ("Jiangsu Dingsheng");

2. Hangzhou Dingsheng Import & Export Co., Ltd. ("Dingsheng IE");

3. Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited ("HK Dingsheng");

4. Hangzhou Teemful Aluminium Co., Ltd. ("Teemful");

5. Hangzhou Five Star Aluminium Co., Ltd. ("Five Star");

6. Inner Mongolia Liansheng New Energy Material Co., Ltd. ("Liansheng");

7. Inner Mongolia Xinxing New Energy Material Co., Ltd. ("Xinxing");

8. Dingheng New Materials Co., Ltd. ("Dingheng");

9. Thai Ding Li New Materials Co., Ltd. ("Thai Ding Li"); and

10. Prosvic Sales, Inc ("Prosvic").

AQR at 1.

In its AQR, Dingsheng explained that it is controlled by its shareholder owners, directors, and managers, not the Government of China ("GOC"), and that it has no direct relationship with

the GOC at any level. *Id*. at 3, Exhibits A-2, A-3. Further, Dingsheng reported that it:

> has full autonomy in its business decisions, purchases, manufacturing, sales and daily management. Under Chinese law and as a matter of practice, Dingsheng is free to export the merchandise under consideration according to its own independent commercial considerations without interference or involvement from any authority. Dingsheng's export prices are set independently of government influence and without the participation or approval of any government authority.

> Dingsheng retains the proceeds from its sales and makes independent decisions regarding the disposition of profits and the financing of losses. Moreover, Dingsheng's contracts and other agreements are negotiated and concluded without oversight by or consultation with any government authority.

> Finally, Dingsheng has autonomy from all government entities regarding the selection of its management.

*Id.* at 3-4.

Dingsheng also reported that the merchandise under consideration ("MUC") produced by Dingsheng is not on any government export provisions lists and that no export quotas apply to the MUC. *Id*. at 6. Dingsheng further explained that its prices are based on "prevailing production costs, sales expenses, and anticipated profit, and determined by negotiations with unaffiliated U.S. customers." *Id.* at 6-7. Concerning the selection of management, Dingsheng reported that its directors are appointed by shareholders, while senior management are appointed either by the shareholders or board of directors. Dingsheng clarified that it is not required to obtain government approval of its selection of directors or managers and that it does not have to notify the GOC of such appointments. *Id*. at 7. Finally, concerning the disposition of profits and financing of losses, Dingsheng reported that: (1) there are no restrictions on its export revenues; (2) its bank accounts are held in its own name; (3) only Dingsheng has access to its bank accounts; and (4) the shareholders determine the disposition and distribution of profits. *Id*. at 8.

Subsequently, in October 2023, Dingsheng filed its responses to Sections C and D of the Department's ADD Questionnaire. Dingsheng Section C Questionnaire Response (Oct. 4, 2023),

C.R. 138-46, P.R. 147 ("CQR"); Dingsheng Section D Questionnaire Response (Oct. 4, 2023),

C.R. 104-37, P.R. 145-46, ("DQR"). In its DQR, Dingsheng reported its factors of production

("FOP") that included, *inter alia*: (1) field 2.4, SELFPRORYAL, self-produced recycled

aluminum; and (2) field 6.1, RECYCLEDAL, by-product recycled aluminum. DQR Exhibit D-

2A. Dingsheng explained field 6.1, RECYCLEDAL, as follows:

> The reported by-products were secondary products derived from the production
> process. Dingsheng either reintroduced these by-products into production or sold
> the byproducts that were generated during the production process of subject and
> non-subject merchandise. No co-product was generated during the production
> process of subject and nonsubject merchandise. . . .
>
> The products being reported as by-products are products having value that were
> produced in the course of the production of the subject and non-subject
> merchandise. Because they are not the primary product being produced, we have
> reported them as by-products. Byproducts were either reintroduced into the
> production process of the subject and non-subject merchandise or sold.

*Id*. at 19.

Dingsheng provided by-product worksheets for Jiangsu Dingsheng, Teemful & Five Star,

Liansheng and Dingheng, which included monthly breakouts of the quantity of recycled

aluminum produced, sold and reintroduced into production. *Id.* Exhibit D-10. As shown in the

**Attachment** to this Brief, these DQR Exhibit D-10 data, summarized on Tab 1, based on the

data on Tabs 2-5, demonstrate that Dingsheng reintroduced [      ] of its by-product recycled

aluminum into production, while selling the remaining [      ]. Dingsheng also provided

corporate records showing the production, sale, and reintroduction of its by-products. *Id*.

Exhibits D-20A–D.

In January 2024, Dingsheng requested that the Department use a simple average of the

average unit values ("AUV") of Malaysian import data reported under HTS subheadings 7601.10

("Aluminum, Not Alloyed, Unwrought") and 7601.20 ("Aluminum Alloys, Unwrought") to

value SELFPRORYAL and RECYCLEDAL because both FOPs are the same, chemically identical, material. Dingsheng First SV Submission Exhibit 1. That same day, Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its individual members (collectively, "Petitioners") requested that Commerce use a simple average of the import AUVs reported under the Romanian HTS subheadings 7601.10 and 7601.20 for valuing SELFPRORYAL and HTS 7602.00 ("Aluminum Waste and Scrap") for valuing RECYCLEDAL. Petitioner Preliminary SV Comments (Jan. 3, 2024), C.R. 180, P.R. 186-89 ("Petitioners Initial SV Submission"), Excel Attachment, Tab: "Dingsheng."

On January 17, 2024, Dingsheng rebutted Petitioners' SV data. Dingsheng First SV Rebuttal Part I (Jan. 17, 2024), P.R. 246-59; Dingsheng First SV Rebuttal Part II (Jan. 17, 2024), C.R. 188, P.R. 260. In this rebuttal, Dingsheng established that its RECYCLEDAL by-product and SELFPRORYAL input FOPs refer to the same (*i.e.*, chemically identical) aluminum material and, consequently, should be valued using the same HTS subheadings. Specifically, Dingsheng provided a declaration from its technical expert supported by photographs from the factory shop floor showing production of by-product RECYCLEDAL and its direct reintroduction as an input, SELFPRORYAL, into production of aluminum foil. Dingsheng First SV Rebuttal Part II, Exhibits 1-2. Dingsheng argued that this evidence established that RECYCLEDAL and SELFPRORYAL should be valued in the same HTS subheading:

> Dingsheng produces Al scrap as a by-product in course of production of Al foil which is thereafter directly reintroduced (without any pretreatment) into production of Al foil. Dingsheng does not subject by-product Al scrap to any pretreatment before reintroduction as self-produced Al scrap. As such, Dingsheng's Self-produced Recycled Al is synonymous with Byproduct Recycled Al, which is generated as a scrap and classified under 7602.00. Likewise, Self-produced Recycled Al too should be valued under 7602.00. This fact rebuts the choice of HTS 7601.10 / 7601.20.

*Id*. List of Attachments with Explanation.

PUBLIC VERSION

Further, Dingsheng submitted multiple industry articles describing the production of aluminum scrap during the manufacturing process and its use as an input in a closed-loop production process, as well as company-specific information describing their self-produced aluminum scrap recycling practices. Dingsheng First SV Rebuttal Part I Exhibits 1-2.

In March 2024, Dingsheng filed its Supplemental Sections A, C, and D Questionnaire Responses, providing detailed information and documentation relating to its byproducts. Dingsheng Supplemental Sections A & C Questionnaire Response (Mar. 11, 2024), C.R. 316-27, PR 308-10 ("SACQR"); Dingsheng Supplemental Section D Questionnaire Response (Mar. 11, 2024), C.R. 257-314, P.R. 305-06, ("SDQR"), at 18-28.

Later that same month, both Dingsheng and Petitioners provided their final SV data. Dingsheng's Final SV Submission (Mar. 27, 2024), P.R. 330-36; Petitioners Final SV Submission (Mar. 27, 2024), P.R. 328-29. Dingsheng continued to argue that HTS subheading 7602.00 data should be used to value both SELFPRORYAL and RECYCLEDAL, while Petitioners continued to proffer an average of HTS subheadings 7601.10 and 7601.20 data for SELFPRORYAL and HTS subheading 7602.00 data alone to value RECYCLEDAL. Dingsheng Final SV Submission Exhibit 1; Petitioners Final SV Submission, Attachment FSV-SUM.

Petitioners filed "pre-preliminary" comments in April 2024, in which they continued to ask that Commerce use an average of HTS subheadings 7601.10 and 7601.20 data for SELFPRORYAL. Petitioners' Pre-Prelim Comments (Apr. 11, 2024), P.R. 352. On April 22, 2024, Dingsheng filed its rebuttal to Petitioners' Pre-Preliminary Comments, in which it explained that record evidence established that "SELFPROPRYAL is identical to . . . RECYCLEDAL . . . {which} in turn, requires that both SELFPRORYAL and RECYCLEDAL should be valued using an identical surrogate value." Dingsheng Pre-Preliminary Rebuttal

11

PUBLIC VERSION

Comments (Apr. 22, 2024), C.R. 438, P.R. 357, at 20-21.

In May 2024, Commerce published its preliminary results for AR5, assigning Dingsheng a 59.52% ADD rate. *Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments: 2022-2023*, 89 Fed. Reg. 35,801, 35,803 (May 2, 2024), P.R. 372 ("*Preliminary Results*"). Although Commerce did not conduct a collapsing analysis or issue a preliminary separate rate memorandum, the Department stated that only certain Dingsheng entities should be treated as a single entity, and that only certain entities were eligible for a separate rate. *Id*. at 35,802-03. Specifically, Commerce identified the same six affiliated Dingsheng entities that it had preliminarily collapsed and assigned a separate rate in AR4 – using essentially verbatim language from the *AR4 Preliminary Results*:

> Consistent with Commerce's treatment of {1} Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited; {2} Hangzhou Dingsheng Import & Export Co., Ltd.; {3} Hangzhou Five Star Aluminium Co., Ltd.; (4} Hangzhou Teemful Aluminium Co., Ltd.; {5} Inner Mongolia Liansheng New Energy Material Co.; and {6} Inner Mongolia Xinxing New Energy Material Co., Ltd. (collectively, Dingsheng) in a prior segment of this proceeding, we have continued to find that these companies are affiliated entities, pursuant to sections 771(33)(E), (F), and (G) of the Act, and that they should be treated as a single entity pursuant to 19 CFR 351.401 (f)(1)–(2).

*Preliminary Results*, 89 Fed. Reg. at 35,802; *see AR4 Preliminary Results*, 88 Fed. Reg. at 29,093.[1]

---

[1] The only differences between the preliminary AR4 and AR5 explanations were that in AR4, Commerce included parenthetical names following the first two Dingsheng entities, HK Dingsheng and Dingsheng IE, and for the Dingsheng IE entity omitted spaces between "Import&Export" in the full company name. *Compare Preliminary Results*, 89 Fed. Reg. at 35,802 *with AR4 Preliminary Results*, 88 Fed. Reg. at 29,093. Note that these parentheticals names for HK Dingsheng and Dingsheng IE appear in the AR5 chart where the collapsed Dingsheng entity was preliminarily assigned the 59.52% ADD rate.

As a result, only those six Dingsheng entities were preliminarily assigned the 59.52% ADD rate calculated based on Dingsheng's data. *Preliminary Results*, 89 Fed. Reg. at 35,803. The four additional Dingsheng entities identified in the AR5 ARQ but who had not participated in AR4 – Dingheng, Jiangsu Dingsheng, Prosvic, and Thai Ding Li – were not listed among the collapsed Dingsheng entity preliminarily assigned the 59.52% ADD rate. *Id*. Two such entities, Dingheng and Jiangsu Dingsheng, were specifically denied a separate rate in the *Preliminary Results*. *Id*. at 35,805. This denial was buried in a long list of companies at the back of Appendix II of the FEDERAL REGISTER notice. *See id*.

To calculate Dingsheng's ADD rate, Commerce preliminarily used HTS subheading 7602.00 data, as suggested by Petitioners, to value RECYCLEDAL. Commerce Preliminary SV Memorandum (Apr. 26, 2024), P.R. 360-61, accompanying Preliminary SV Workbook, Tab: "Dingsheng." In contrast, for valuing the purchased recycled aluminum input, PURRYAL and SELFPRORYAL, which are interchangeable, the Department applied the HTS subheading combination of 7601.10 and 7601.20. *Id.*

## III.    AR5 BRIEFING THROUGH THIS APPEAL

Following the *Preliminary Results*, Dingsheng in June 2024 filed an administrative Case Brief, requesting that Commerce apply an identical SV for Dingsheng's self-produced recycled aluminum (SELFPRORYAL) and its by-product recycled aluminum (RECYCLEDAL) FOPs, given that considerable record evidence had established that they are chemically identical aluminum materials. Dingsheng Case Brief (June 7, 2024), C.R. 452-56, P.R. 386-88, at 48-51. Petitioners subsequently filed their Rebuttal Brief arguing that Commerce should continue to use separate and distinct HTS subheading to value RECYCLEDAL and SELFPRORYAL. Petitioners Rebuttal Brief (June 21, 2024), C.R. 461, P.R. 396, at 71-74.

In November 2024, Commerce published its *Final Results* for AR5 in the *Federal Register*. *Final Results*, 89 Fed. Reg. 88,972. Dingsheng was assigned a final AR5 ADD rate of 60.61%, while Zhongji, the other mandatory respondent, was assigned a final AR5 ADD rate of 75.65%. *Id*. at 88,974. Commerce continued to reject Dingsheng's arguments that RECYCLEDAL and SELFPRORYAL should be valued in the same HTS subheading and continued to use different HTS subheadings to value the two FOPs. Commerce Final SV Memorandum (Nov. 5, 2024), P.R. 405-06, accompanying Final SV Workbook. Commerce also continued to value PURRYAL using an average of data in HTS subheadings 7601.10 and 7601.20. *Id.*

Further, Commerce's single entity determination remained unchanged. The collapsed Dingsheng entity assigned the 60.61% ADD rate remained limited to the six Dingsheng entities that participated in AR4 and omitted the four additional Dingsheng entities that participated in AR5. *Final Results*, 89 Fed. Reg. at 88,972. Jiangsu Dingsheng and Dingheng, despite being identified in Dingsheng's AR5 AQR as members of the collective Dingsheng entity, were specifically treated as part of the China-wide entity. *Id*. at 88,975; AQR at 1.

In November 2024, one day before the *Final Results* were published, Dingsheng timely filed a clerical error claim. Dingsheng Clerical Error Comments (Nov. 11, 2024), P.R. 412 ("Clerical Error Allegation"). Dingsheng requested that Commerce correct its clerical error that resulted in a separate rate denial for the four Dingsheng entities identified in the AR5 AQR that had not been identified in AR4. *Id*. In January 2025, Commerce denied Dingsheng's clerical error allegation and declined to modify the *Final Results*. Commerce Ministerial Error Allegation Memorandum (Jan. 7, 2025), P.R. 418 ("Ministerial Error Memo").

14

Following publication of the *Final Results*, Commerce in November 2024 issued cash deposit instructions to U.S. Customs and Border Protection ("CBP") that were inconsistent with the *Final Results*. Message No. 4323404 (Nov. 18, 2024), P.R. 415. These instructions incorrectly assigned Dingsheng the cash deposit rate of 75.65%, which was Zhongji's calculated rate, and incorrectly assigned Zhongji the cash deposit rate of 60.61%, which was Dingsheng's rate. *Id*. Months later, in February 2025, Dingsheng requested that Commerce correct this clerical error. Letter from GDLSK to Commerce (Feb. 7, 2025), P.R. 424 ("Request for Instruction Correction").

Dingsheng initiated this appeal in December 2024. Summons (Dec. 12, 2024), ECF 1; Amended Summons (Jan. 21, 2025), ECF 18; Complaint (Jan. 13, 2025), ECF 9; Amended Complaint (Jan. 31, 2025), ECF 21. Dingsheng appealed, *inter alia*, Commerce's: (1) selection of SVs for Dingsheng's self-produced recycled aluminum scrap input and by-product recycled aluminum; (2) failure to grant all Dingsheng companies a separate rate; and (3) cash deposit instructions to CBP. Amended Complaint at 6-7 ¶¶ 23-24, 27-30.[2] In July 2025, Defendant, without court involvement, corrected the cash deposit instructions issued to CBP – correcting the obvious typographical error in which CBP was instructed to collect ADD cash deposits on Dingsheng entries at the ADD rate assigned to the other mandatory respondent in the *Final Results*, and *vice versa*. Consent Notice of Corrective Action (July 3, 2025), ECF 26; Status Report on the Corrective Action (July 10, 2025), ECF 27.

---

[2] Dingsheng is not pursuing the other issues that it appealed challenging Commerce's AR5 surrogate country selection, financial statement selection, and denial of double remedies offset. Amended Complaint ¶¶ 17-22, 25-26.

PUBLIC VERSION

## ARGUMENT

I.    **COMMERCE UNLAWFULLY VALUED DINGSHENG'S RECYCLED ALUMINUM BY-PRODUCT**

As set forth below, Commerce's decision to value RECYCLEDAL (by-product recycled aluminum) using subheading 7602.00 data should be reversed. The record confirms that RECYCLEDAL is identical to, and fungible with, self-produced recycled aluminum (SELFPRORYAL). As such, in order to calculate Dingsheng's ADD margin in an accurate and reasonable manner, as required by law, RECYCLEDAL and SELFPRORYAL should be valued in the same manner. The record reveals that Commerce valued these inputs in the same manner in prior proceedings and that this policy was affirmed by this Court. For these reasons, Commerce's valuation of RECYCLEDAL was not supported by substantial evidence and contrary to law.

### A.    Dingsheng Directly Reintroduced a Predominant Portion of Its By-Product RECYCLEDAL as a Production Input

A declaration by Jiangsu Dingsheng's in-house technical expert, accompanied by photographs, demonstrates that RECYCLEDAL was generated by a ***closed-loop*** process followed by its ***direct reintroduction*** (without any pretreatment) as a rechristened, self-produced, recycled aluminum input into the production cycle of aluminum foil. Dingsheng First SV Rebuttal II Attachment 1. The declaration confirms that SELFPRORYAL and RECYCLEDAL describe the same material, having identical physical and chemical (grade) properties:

[

16

]

Dingsheng First SV Rebuttal Part II Attachment 1 (emphases added).

Record evidence reveals that [     ] of Dingsheng's recycled aluminum by-product was reintroduced in production and used in the identical manner as Dingsheng's self-produced recycled aluminum input. *Id*.; **Attachment**; DQR Exhibit D-10. The record also establishes that the remaining [     ] of RECYCLEDAL that Dingsheng resold had the identical chemical composition and physical characteristics as the [     ] directly reintroduced into production. **Attachment**; DQR Exhibit D-10; Dingsheng First SV Rebuttal Part II Attachment 1. Thus, there is no difference between Dingsheng's reintroduced and sold by-product recycled aluminum, and the manner of disposal (*i.e.*, by selling) of a portion of by-product recycled aluminum, which is

otherwise indistinguishable from the portion that was reintroduced into the production cycle should not result in a different valuation of the two streams. Accordingly, substantial evidence does not support Commerce assertion that "there is nothing on the record establishing that scrap sold from Dingsheng's warehouse should be assigned the value of aluminum ingots." IDM at 9.

Moreover, it is undisputed that Dingsheng's purchased recycled aluminum input (PURRYAL) and self-produced recycled aluminum inputs are interchangeable. Indeed, Commerce valued these two types of recycled aluminum inputs identically, based on an average of HTS subheading 7601.10 and 7601.20 data. In light of the above facts, the record does not support Commerce's divergent SV selections for SELFPRORYAL and RECYCLEDAL, because Dingsheng's recycled aluminum by-product – whether reintroduced into the production cycle or sold as such – is merely antecedent to Dingsheng's self-produced aluminum input, but otherwise indistinguishable in physical and chemical characteristics. Instead, both FOPs must have an identical surrogate value. Given that Commerce chose an average of HTS subheadings 7601.10 and 7601.20 data to value the self-produced recycled aluminum input (as well as the purchased recycled aluminum input), Commerce was required to value Dingsheng's recycled aluminum by-product based on HTS subheadings 7601.10 and 7601.20 as well.

For these reasons, Commerce's choice of HTS subheading 7602.00 data to value RECYCLEDAL is unsupported by substantial evidence.

**B. Aluminum Industry Information Corroborates Dingsheng's Direct Re-Introduction of Recycled Aluminum By-Product as an Input for Production**

Independent public domain information corroborates Dingsheng's technical expert's Declaration that RECYCLEDAL should be valued in the same manner as SELFPRORYAL.

First, aluminum industry information supports the fact that in a closed-loop production system, new aluminum by-products that are introduced into production and recycled aluminum

18

(new aluminum scrap) are interchangeable products that have the same value. Dingsheng First

SV Rebuttal Part I Exhibits 1-2 & 3B. The pertinent record evidence is summarized below.

### 1. *Aluminum Recycling*, EUROPEAN ALUMINIUM ASSOCIATION (May 3, 2002)

This article published by EUROPEAN ALUMINIUM ASSOCIATION confirms that recycled

aluminum scrap (*i.e.*, new scrap) is reintroduced into a smelter for production:

> **New Scrap**
>
> New scrap is the surplus material that is discarded during the manufacturing and fabrication of aluminium alloys (e.g. the splinters of sheet edge trimmings).
>
> Most **new scrap** reaching the secondary industry comes directly from the manufacturing industry. It **is usually of known quality and composition** and often uncoated. It **can therefore be melted down with little preparation**. 100% of the arising fabrication scrap is remelted by the aluminium industry.

*Id.* Exhibit 1A (emphases added).

Likewise, Dingsheng's "{recycled aluminum by-product} . . . is usually of known quality

and composition and . . . can therefore be melted down with little preparation." This fact in turn

establishes that Dingsheng's recycled aluminum by-product has the same intrinsic value as the

prime aluminum material input.

### 2. D. Lyons et al., Circuits of Scrap: Closed Loop Industrial Ecosystems and the Geography of US International Recyclable Material Flows 1995-2005, 175 THE GEOGRAPHICAL JOURNAL 286 (2009)

This article explains that "the recycling of scrap material has been identified as an

important strategy in the larger theory of industrial ecology." *Id.* Exhibit 1B at 286. Moreover,

the article states:

> Industrial ecology is a collective term for a number of business-centred systems-oriented approaches to improve the eco-efficiency of industry. In essence, it argues that the traditional model of industrial activity, where individual manufacturing processes take in raw materials and generate products to be sold plus waste for disposal, needs to be transformed into a **'closed loop' industrial ecosystem where used materials (scrap) and by-products would substitute for virgin materials during production processes via material recycling** . . . .

19

PUBLIC VERSION

The element of industrial ecology of interest here is the **concept of developing closed loop industrial eco-systems via the material recycling of scrap**, that is, the **substitution of virgin materials by scrap materials** (pre and post consumer) **during production processes**. 'Scrap" refers to material that is available for recycling and has economic value. In other words, scrap is a secondary commodity material that is traded either locally, regionally, nationally or globally. Scrap is defined as either new or old, with new scrap indicating scrap from pre-consumer sources, and old suggesting post-consumer sources. For example, when metal is processed into stock shapes such as sheets or bars at a smelter or when sheets and bars are assembled into products in manufacturing plants, the leftover material in the form of cuttings, trimmings, stampings, turnings and off-specification is new scrap. Pre-consumer or **new scrap is generally of known composition and can be easily and quickly returned to a smelter, mill or basic polymer facility to produce new virgin material.**

*Id*. at 287-88 (emphases added).

Likewise, Dingsheng has a "'closed loop' industrial ecosystem where used materials (scrap) and by-products . . . substitute for virgin materials during production processes." *Id*. at 287.

### 3. L. Muchová & P. Eder, *End-of-waste Criteria for Aluminium and Aluminium Alloy Scrap*, JRC SCIENTIFIC AND TECHNICAL REPORTS (2010)

This article published by JRC SCIENTIFIC AND TECHNICAL REPORTS provides an overview of aluminum scrap recycling:

One way of classifying scrap is to distinguish it according to its source; from the aluminium processing (new scrap), and scrap from products after their use (old scrap).

**New scrap is generated during the initial manufacturing processes**. . . . The composition of new scrap is well known and in principle **new scrap does not need any pretreatment process before it is remelted**, although cutting to size might be necessary. New scrap could be considered a by-product and not waste . . . .

*Id.* Exhibit 1C at 7 (emphases added).

Likewise, Dingsheng's "{recycled aluminum by-product} is generated during the initial manufacturing processes {and} . . . does not need any pretreatment process before

20

it is remelted." *Id.*

**4. J. Blomberg & P. Söderholm, The Economics of secondary aluminium supply: An econometric analysis based on European Data, 53 RESOURCES, CONSERVATION AND RECYCLING 455-63 (2009)**

This article analyzes the economics of the secondary aluminum supply in Western

Europe:

> Recycled metal is also often a near perfect substitute for primary metal given that the properties of metals (i.e., ductility, conductivity, etc.) are not lost when the metal is used and finally scrapped.
>
> *New scrap* (or prompt-, process- or manufacturers scrap) arises and is recovered during all stages in the manufacturing chain, from original smelting and refining through semi-production to the production of final goods, regardless of whether the products are made from primary or scrap metal. Examples are clippings, borings and trimmings or the skeleton remaining after can lids are stamped out of aluminium sheets. The volume of new scrap is hence closely linked to the level and the technology of aluminium manufacturing containing products.

*Id.* Exhibit 1D at 455-57.

This article corroborates Dingsheng's production of the recycled aluminum by-product

and its subsequent use as a self-produced recycled aluminum input material, thereby confirming

that Dingsheng's by-product, recycled aluminum, has the same value as the corresponding input,

self-produced recycled aluminum.

**5. V, Kevorkijan, *Advances in Recycling of Wrought Aluminium Alloys for Added Value Maximisation*, ASSOCIATION OF METALLURGICAL ENGINEERS OF SERBIA, 16 MJoM 103-14 (2010)**

This article describes the recycled aluminum market in Europe:

> {I}n new scrap resulting from the collection and/or treatment of the metal that arises during the production of aluminium products before these are sold to the final users, the right alloy composition is assured in advance; however, **the cost of such scrap is significantly higher and its availability is usually limited to closed production loops.**

*Id*. Exhibit 1E at 106 (emphasis added).

21

Dingsheng's recycled aluminum by-product costs significantly more than the inferior municipal grade old aluminum scrap, which is properly classified under HTS subheading 7602.00, because the recycled aluminum by-product is a new scrap that is reintroduced into production as a self-produced recycled aluminum input in a closed loop production operation. Its cost is significantly higher compared to inferior grade municipal grade old aluminum scrap, which is properly classified under HTS subheading 7602.00. This distinguishes Dingsheng's prime (new) scrap from municipal (old) scrap.

### 6. USITC: Unwrought and Wrought Aluminum Questionnaire

The United States International Trade Commission's ("USITC") 2016 questionnaire used to assess the global competitiveness of the U.S. aluminum industry contained the following instructive definition:

> **Unwrought aluminum**: Aluminum products in the form of ingots, blocks, billets, slabs and similar manufactured forms, but not rolled, forged, drawn or extruded products, tubular products or cast or sintered forms which have been machined or processed otherwise than by simple trimming, scalping or descaling. These products are typically created from molten aluminum at a **primary** smelter (where the raw material is alumina) or a **secondary** smelter (where the raw material is scrap).

*Id.* Exhibit 3B-1 at 4 (emphases modified).

Dingsheng's recycled aluminum by-product is a kind of unwrought aluminum scrap that is reintroduced into production in a secondary smelter. As such, Dingsheng's recycled aluminum by-product has a value that is equivalent to other unwrought aluminum inputs (*e.g.*, billets or ingots), with which it is commingled. The recycled aluminum by-product accordingly has a much higher value compared to the aluminum scrap classified under HTS subheading 7602.00.

### 7. Global Aluminum Recycling: A Cornerstone of Sustainable Development, INTERNATIONAL ALUMINIUM INSTITUTE (2009)

A report by the INTERNATIONAL ALUMINIUM INSTITUTE summarizes the substantial

22

advantages of aluminum compared to competing materials in terms of recyclability and

sustainable development:

> **Aluminium scrap has considerable market value because most of the energy required for the production of primary aluminium is embodied in the metal itself and, consequently, in the scrap**. Therefore, the energy needed to melt aluminium scrap is only a fraction of that required for primary aluminium production. Furthermore, if pre-treated and/or sorted, **aluminium products can be recycled for use** in almost all aluminium applications **since the metal's atomic structure is not altered during melting.**

*Id.* Exhibit 3B-2 at 12 (emphases added).

As such, the recycled aluminum by-product retains an identical chemical composition

and contains the same level of energy as the prime aluminum raw material input. This explains

why it is reintroduced into production without any pretreatment.

*        *        *

In sum, aluminum industry information demonstrates that new aluminum scrap produced

as a by-product during production of aluminum products is directly reintroduced – without any

pretreatment – into the production of aluminum products. Unlike old scrap, new scrap is

typically not subjected to any pretreatment. This corroborates Dingsheng's production process

and contradicts Commerce's choice of HTS subheading 7602.00 data for valuing

RECYCLEDAL. Instead, this information supports valuing Dingsheng's by-product, recycled

aluminum, RECYCLEDAL, at the same price as the corresponding reintroduced input, self-

produced recycled aluminum, SELFPRORYAL (*i.e.*, based on HTS subheadings 7601.10 and

7601.20).

### C.  Company-specific Information Corroborates Dingsheng's Position That RECYCLEDAL and SELFPRORYAL Should be Valued in the Same Manner

The record contains information from aluminum companies describing their self-

produced new aluminum scrap recycling practices. Dingsheng First SV Rebuttal Part I Exhibit 2.

23

This information confirms that aluminum scrap generated as a by-product during the production of aluminum products is directly reused (without further treatment or value addition) as an input in the production cycle. Summarized below is record evidence pertaining to aluminum producers' reliance on recycling for their input requirements.

### 1. Alumat

Alumat, a producer of aluminum products, relies predominantly on consumption of recycled aluminum inputs – *i.e.,* internal scrap generated during the production of aluminum products being ploughed back into production:

> Alumat actively invests in enhancing productivity across our 20 casthouses, ensuring efficiency in internal scrap recycling processes. . . .

> Over 50 percent of our aluminum production originates from internal scrap recycling and billets of remelted aluminum supplied by external partners, underlining our commitment to sustainable sourcing.

*Id.* Exhibit 2C.

This production feature shows that the recycled aluminum by-product, whether produced by Alumat or Dingsheng, is akin to prime aluminum raw material and is typically recycled for production by other aluminum producers.

### 2. Hydro

Hydro, another aluminum products producer, reports that "{m}ore than 50 percent of all aluminum in our production stems from internal scrap recycling." *Id*. Exhibit 2D. This confirms that recycled aluminum by-products have a high commercial value and supports their valuation at the same price as the corresponding input, self-producer recycled aluminum.

### 3. Dynacast

Dynacast, another aluminum products producer, also recycles aluminum for production, aluminum scrap or by-product generated during manufacturing operations:

> At Dynacast, we send off all scrap that was produced as a by-product of our operations to be recycled and used for future projects. The closed-loop cycle prevents waste from going to landfills.

*Id.* Exhibit 2B. Therefore, Dynacast's closed loop cycle, which mirrors Dingsheng's recycling operations, supports valuing the recycled aluminum by-product at the same price as the self-produced recycled aluminum input.

### 4.  Novelis

Novelis has a closed loop recycling operation too, which it touts as "the largest automotive closed-loop recycling system in the world." *Id.* Exhibit 2E. Novelis describes this operation as follows:

> The closed -loop system recycles scrap aluminum from the automotive manufacturing process. Closed-loop recycling allows us to take back as much of our customers' aluminum scrap as possible, turning it directly back into the same product again. Closing the loop preserves the value of the alloy, reduces recycling and transportation costs, minimizes environmental impact and establishes a secure supply chain.

*Id.* As such, Novelis' closed loop production cycle mirrors Dingsheng's recycling operations, and supports valuing the recycled aluminum by-product at the same price as the self-produced recycled aluminum input.

*            *            *

In sum, this record evidence supports Dingsheng's position that RECYCLEDAL is physically indistinguishable from SELFPRORYAL and that RECYCLEDAL is directly reintroduced (**without any further pretreatment**) into the production of aluminum foil. Because this closed loop operation ***does not involve any value addition***, Commerce erred by valuing RECYCLEDAL at a lower price (as aluminum scrap in HTS subheading 7602.00) than the reintroduced input, SELFPRORYAL (identical to RECYCLEDAL) that is valued based on averaging prime material, unwrought aluminum under HTS subheadings 7601.10 and 7601.20.

### D. Commerce's Longstanding Practice is To Value RECYCLEDAL by Averaging HTS 7601.10 and 7601.20

Commerce's choice of aluminum scrap HTS subheading 7602.00 to value RECYCLEDAL directly contradicts its longstanding practice of valuing recycled aluminum by-products with the same SV as the corresponding recycled aluminum inputs, which are subsequently reintroduced into production. In an identical factual scenario, Commerce valued the recycled aluminum by-product at the same price as the corresponding reintroduced recycled aluminum input:

> Commerce's practice is to value inputs that are recycled by being reintroduced into the production process as substitutes of the original input with values based on the original source input. Because run-around scrap is reintroduced into the production process, it should be valued based on the original inputs for which run-around scrap is substituted in the production process. We find that the record demonstrates that run-around scrap is a substitute for certain alloyed and unalloyed aluminum inputs. Accordingly, we find an average value of import data for HTS 7601.10 "Aluminum, Not Alloyed, Unwrought," and HTS 7601.20 "Aluminum Alloys, Unwrought," is appropriate to value Alcha's run-around scrap. Thus, **we continue to value the reintroduced recycled aluminum input and the aluminum scrap by-product using the average value of import data for HTS subheadings 7601.10 and 7601.20**.

*Common Alloy Aluminum Sheet from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 54,975 (Sept. 8, 2022), IDM Comment 5 (emphasis added).

Similarly, in the LTFV investigation leading to the issuance of the *Aluminum Foil ADD Order*, Commerce valued Dingsheng's by-product recycled aluminum under HTS subheading 7601.20 – which was also used to value several aluminum alloy inputs. Dingsheng First SV Rebuttal Part I Exhibit 3A-3: *Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination,* 82 Fed. Reg. 50,858 (Nov. 2, 2017), accompanying Preliminary SV

Memorandum (Oct. 26, 2017), at 4, Attachments 2-3, unchanged, *Certain Aluminum Foil from the People's Republic of China: Final Determination of Sales at Less-Than-Fair Value*, 83 Fed. Reg. 9282 (Mar. 5, 2018).

Likewise, in the first administrative review of the *Aluminum Foil ADD Order*, the Department valued the by-product, aluminum foil scrap under HTS 76020090, which was also used to value the corresponding reintroduced aluminum input aluminum foil scrap reused. *Id.* Exhibit 3A-5: *Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Partial Rescission; 2017-2019*, 85 Fed. Reg. 37,829 (June 24, 2020), accompanying Preliminary SV Memorandum (June 18, 2020), Attachment 1, unchanged *Certain Aluminum Foil from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 2017-2019*, 86 Fed. Reg. 17,358 (Apr. 2, 2021).

This precedent under this *Aluminum Foil ADD Order* directly contradicts Commerce's disjunctive HTS selection in AR5 to value the recycled aluminum by-product as waste and scrap under HTS subheading 7602.00, when the substantially identical self-produced recycled aluminum input was valued as prime unwrought aluminum material under an average of HTS subheadings 7601.10 and 7601.20 data. Accordingly, Commerce's choice of HTS subheading 7602.00 to value Dingsheng's RECYCLEDAL, besides being unsupported by substantial evidence, inexplicably and unlawfully contradicts controlling Department precedent. "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF I*, 630 F.3d at 1373.

### E. *Zhongji* supports valuing RECYCLEDAL at an average of HTS 7601.10 and 7601.20

In the *Final Results*, Commerce attempted to distinguishe its practices for valuing by-

27

product recycled aluminum and recycled aluminum scrap sold as such:

> Commerce's practice . . . is to value scrap . . . reintroduced into production to replace ingots using the Harmonized System (HS) subheading 7601.20 (the provision for alloyed ingots) while assigning scrap that is sold as scrap using the HS subheading 7602).

IDM at 9. Commerce then claimed that its "practice has been affirmed by the CIT." *Id.* (citing *Jiangsu Zhongji Lamination Materials Co. v. United States*, 396 F. Supp. 3d 134 (CIT 2019) ("*Zhongji*")).

This justification should be rejected. First, Dingsheng does not sell RECYCLEDAL as scrap; rather, [    ] of Dingsheng's recycled aluminum by-product was reintroduced in production and used in the identical manner as Dingsheng's self-produced recycled aluminum input. **Attachment**; DQR Exhibit D-10; Dingsheng Final SV Submissions Part II Attachment 1. The remaining [    ] of RECYCLEDAL that Dingsheng resold had identical chemical composition and physical characteristics as the [    ] directly reintroduced into production. **Attachment**; DQR Exhibit D-10; Dingsheng Final SV Submissions Part II Attachment 1.

Moreover, Commerce misplaces reliance on *Zhongji*, which arose from an appeal of the LTFV investigation leading to issuance of the *Aluminum Foil ADD Order*. Contrary to Defendant's claim, this Court in *Zhongji* endorsed Commerce's decision to value Dingsheng's by-product recycled aluminum reintroduced as an input into production, on par with aluminum ingot classified under HTS 7601.20, instead of as aluminum scrap and waste under HTS 7602.00. Such an endorsement is found in this Court's discussion of the differences between Zhongji and Dingsheng's recycled aluminum:

> Zhongji claims that its scrap was pure enough to be reintroduced into the production process, . . . but the aluminum scrap's chemical composition was of little consequence given the manner in which Zhongji actually disposed of its aluminum scrap. . . . Commerce therefore had reason to value the scrap using subheading 7602.00.

PUBLIC VERSION

Zhongji argues that Commerce arbitrarily valued Zhongji's aluminum scrap and Dingsheng's recycled aluminum byproduct using different HTS subheadings. . . . This argument is unpersuasive because the two respondents were not similarly situated regarding this issue. . . . **Zhongji claims that Commerce should have valued Zhongji's aluminum scrap using the same subheading 7601.20 used to value Dingsheng's recycled aluminum byproduct**, as Zhongji's scrap was more chemically similar to Dingsheng's recycled aluminum byproduct than to Dingsheng's aluminum scrap. . . . **This argument fails to account for the fact that Zhongji and Dingsheng disposed of their aluminum scrap and aluminum byproduct in very different ways.** . . . Commerce was consistent in basing its selection of the best available information on the manner in which the respondents actually used the aluminum in question rather than on the aluminum's chemical composition, and its valuation of Zhongji's aluminum scrap was thus neither arbitrary nor capricious and was consistent with the record. Commerce's selection of data to value Zhongji's aluminum scrap was supported by substantial evidence and in accordance with law, and is affirmed.

*Zhongji*, 396 F. Supp. 3d at 1351-52 (emphases added).

As such, Commerce chose HTS subheading 7601.20 instead of 7602.00, to value Dingsheng's by-product recycled aluminum that was reintroduced as an input. *Id*. The record evidence in AR5 establishes that [      ] of Dingsheng's RECYCLEDAL was directly reintroduced as an input, self-produced recycled aluminum. **Attachment**; DQR Exhibit D-10; Dingsheng Final SV Submissions Part II Attachment 1. Therefore, in this case, Commerce improperly relied upon *Zhongji* because that decision in fact repudiates Commerce's decision to select HTS subheading 7602.00 for the entirety of Dingsheng's RECYCLEDAL FOP.

Having erroneously applied *Zhongji*, Commerce further failed to recognize that before deviating from its prior position on the same issue, it needed compelling and adequate reasons to do so. *See, e.g., Queen's Flowers de Colom. v. United States,* 21 CIT 968, 976-77 (1997) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . . The rule also . . . 'prohibit{s} the agency from adopting significantly inconsistent policies that result in the creation of 'conflicting lines of precedent

governing the identical situation. . . . Commerce has the flexibility to change its position,

provided that it explains the basis for its change and that the explanation is in accordance with

law and supported by substantial evidence. Commerce gave no explanation for its departure from

its position in *Roses* and *Pocket Lighters*. In fact, Commerce did not acknowledge that an

inconsistency exists between those cases and the determination here."); *Tung Mung Dev. Co. v.*

*United States*, 25 CIT 752, 770-73 (2001) ("The case for judicial deference is less compelling

with respect to agency positions that are inconsistent with previously held views."). Thus,

Commerce's decision, contradicted by its own precedent, is unlawful.

      Further, *Zhongji* supports using an average of HTS subheadings 7601.10 and 7601.20 to

value [   ] of RECYCLEDAL. Record evidence shows that Dingsheng consumed both non-

alloy grade aluminum inputs such as aluminum ingot, classified under HTS 7601.10, and alloy

grade aluminum inputs, such as aluminum copper alloy and aluminum iron alloy, classified

under HTS 7601.20. DQR Exhibit 2A, Fields 2.6–2.12. Therefore, the resulting by-product

recycled aluminum is a mix of non-alloy and alloy aluminum. Following *Zhongji*, Commerce

was accordingly required to value [   ] of RECYCLEDAL under the subheadings covering

aluminum ingot of both non-alloy and alloy grades, *i.e.* based on an average of HTS subheadings

7601.10 ("Aluminum, Not Alloyed, Unwrought") and 7601.20 ("Aluminum Alloys,

Unwrought"), which Commerce notably used to value the corresponding reintroduced input,

SELFPRORYAL.

      In sum, *Zhongji* contradicts Commerce's choice of HTS subheading 7602.00 for the

entirety of RECYCLEDAL.

**F.  Substantial Evidence Contradicts Commerce's Justification for Relying on HTS 7602.00 to Value the Entire RECYCLEDAL**

To support its *Final Results,* Commerce asserted that "there is nothing on the record establishing that scrap sold from Dingsheng's warehouse should be assigned the value of aluminum ingots." IDM at 9. This justification is factually inaccurate. The record contains substantial, uncontradicted evidence that Commerce misstates the undisputed fact that Jiangsu Dingsheng's and Liansheng's RECYCLEDAL were primarily reintroduced as such into production as an input, self-produced recycled aluminum, SELFPRORYAL; indeed, only a small quantity of their by-product recycled aluminum was sold as scrap. DQR Exhibits D-10.1 & D-10.3, **Attachment** Tabs 2 & 4. Conversely, Five Star, Teemful, and Dingheng sold their by-product recycled aluminum, as they did not have cast rolling facilities to reutilize these recycled aluminum by-products into production. *Id*. Exhibits D-10.2 & D-10.4; **Attachment** Tabs 3 & 5. When the experiences of these companies are combined, the record reveals that Dingsheng reintroduced [     ] of its by-products recycled aluminum into production. **Attachment**; DQR Exhibit D-10.

In sum, Commerce incorrectly concluded that "there is nothing on the record establishing that scrap sold from Dingsheng's warehouse should be assigned the value of aluminum ingots." IDM at 9. [     ] of RECYCLEDAL was reintroduced into production, and accordingly, should be assigned the same value as SELFPRORYAL. **Attachment**; DQR Exhibit D-10; Dingsheng Final SV Submissions Part II Attachment 1. And the remaining [     ] is physically identical to the RECYCLEDAL reintroduced into production and, accordingly, should be valued in an identical manner. **Attachment**; DQR Exhibit D-10; Dingsheng Final SV Submissions Part II Attachment 1. These errors compound Commerce's legal misstep arising from its flawed reliance of *Zhongji*. Section I.E, *supra*.

31

PUBLIC VERSION

**II.    COMMERCE'S FAILURE TO GRANT ALL DINGSHENG COMPANIES A SEPARATE RATE WAS CONTARY TO LAW**

In AR5, Commerce unlawfully: (a) found that its grant of a separate rate to only those Dingsheng entities that participated in AR4 was not a ministerial error; and (b) declined to correct that erroneous separate rate identification.

**A.    Commerce Unlawfully Found That Its Separate Rate Grant to Only Certain AR5 Dingsheng Entities Was Not a Ministerial Error**

In response to Dingsheng's Clerical Error Allegation, Commerce found that its separate rate identification of only certain Dingsheng entities did not qualify as a "ministerial error." Ministerial Error Memo at 3. Commerce reasoned:

> Dingsheng's allegation does not constitute an error in addition, subtraction, copying, or any other type of unintentional error that is ministerial in nature. Rather, **the error that Dingsheng alleges relates to the methodological question of whether Commerce should have conducted a separate rate analysi**s and assigned a separate rate to Xinxing, Dingheng, Dingli, and Prosvic for the *Final Results*. Thus, **Dingsheng's alleged error concerns Commerce's decision not to apply a separate rate methodology and analysis to the four identified companies, and not an unintentional error** in addition, subtraction, copying, or other ministerial error. Hence, we find that the error alleged by Dingsheng does not constitute a ministerial error within the meaning of section 751(h) of the Act and 19 CFR 351.224(f).

Ministerial Error Memo at 3-4 (emphases added). As discussed below, this decision is wrong.

A "ministerial error" is defined by statute and Department regulations as "an error in addition, subtraction, or other arithmetic function, **clerical error resulting from inaccurate copying, duplication, or the like**, and any other similar type of unintentional error which the Secretary considers ministerial." *Id*. at 2; 19 C.F.R. § 351.224(f); 19 U.S.C. § 1675(h) (emphasis added). As the Court of Appeals for the Federal Circuit ("CAFC") recognizes, "{c}lerical errors are by their nature not errors in judgment but merely inadvertencies." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). In other words, clerical or ministerial errors

are those that are "mechanical in nature, apparent on the record, and not involving an error of substantive judgment, or includes only mindless and mechanistic mistakes and minor shifting of facts." *Shinhan Diamond Indus. Co. v. United States*, 34 CIT 227, 231 (2010) (internal quotations omitted).

Here, Commerce's error falls squarely within the term ministerial error, described above. In AR5, Commerce merely **copied and pasted** the names of Dingsheng companies eligible for a separate rate in AR4 rather than including all Dingsheng affiliates named in Dingsheng's AR5 submissions as entitled to a separate rate. The *Preliminary Results* listed nearly verbatim the six affiliated Dingsheng entities preliminarily collapsed and granted a separate rate in AR4, without reference to the additional Dingsheng entities on whose behalf the Dingsheng AR5 AQR was filed. *Compare Preliminary Results*, 89 Fed. Reg. at 35,802-03 *with AR4 Preliminary Results*, 88 Fed. Reg. at 29,093; AQR at 1. Given the complete absence of any analysis establishing that the Dingsheng entities identified for the first time in AR5 should not be collapsed or otherwise denied a separate rate, their omission was "mechanical in nature, apparent on the record, and not involving an error of substantive judgment, or includes only mindless and mechanistic mistakes and minor shifting of facts." *Shinhan Diamond*, 34 CIT at 231. Had Commerce relied on any methodological basis to decline to collapse all Dingsheng AR5 AQR entities or to deny certain entities a separate rate, Commerce would have memorialized its analysis in memoranda issued contemporaneously with the *Preliminary Results* – but it did not do so.

Substantial evidence does not support Commerce's findings that: (1) "Dingsheng's allegation does not constitute an error in addition, subtraction, copying, or any other type of unintentional error that is ministerial in nature"; and (2) "the error that Dingsheng alleges relates to the methodological question of whether Commerce should have conducted a separate rate

analysis." Ministerial Error Memo at 3. By ignoring the fact that the allegation was based on a

copy and paste error from AR4, Commerce failed to "tak{e} into account contradictory evidence

or evidence from which conflicting inferences could be drawn." *Gerald Metals*, 132 F.3d at 720.

By characterizing its Dingsheng entity separate rate determination as methodological without

considering either the complete lack of agency analyses concerning the separate rate eligibility of

entities added in AR5, or the clear error in carrying over the entity listing from AR4, Commerce

failed to "take into account whatever in the record fairly detracts from its weight." *Id.* (quoting

*NLRB*, 340 U.S. at 488). Accordingly, this Court should reverse Commerce's erroneous finding

in AR5 that its Dingsheng entity separate rate identification did not constitute a ministerial error.

## B.  Commerce Unlawfully Declined to Correct its Erroneous Separate Rate Identification

Commerce unlawfully refused to correct its erroneous separate rate identification of the

Dingsheng entities in its Clerical Error Allegation Memorandum. As an initial matter, Commerce

undisputably has the authority to correct such errors. As this Court recognizes:

> The power of an administrative agency to correct its own ministerial errors is
> presumed and considered analogous to the power of a court to correct ministerial
> errors set forth in the Federal Rule of Procedure Rule 60(a). . . . Congress
> expressly delegated that power to the Department by the enactment of section
> 1333 of The Omnibus Trade and Competitiveness Act of 1988 . . . ."

*Shinhan Diamond*, 34 CIT at 230 (citing *American Truck Ass'n v. Frisco*, 358 U.S. 133, 145

(1958)).

Indeed, Commerce has an affirmative obligation to correct ministerial errors such as

those raised by Dingsheng. Three decades ago, the CAFC recognized that Congress explicitly

required Commerce "to correct its ministerial errors (which includes clerical errors) brought to

its attention within a reasonable time after the final determinations are issued." *NTN Bearing*

*Corp. v. United States*, 74 F.3d 1204, 1207 (Fed. Cir. 1995) (citing 19 U.S.C. § 1675(f)). This

Congressional direction stems from the Commerce's duty to calculate ADD margins "as accurately as possible" – even if doing so requires Commerce to sometimes go back after a final determination to correct its own ministerial errors. *Id.* at 1208 (quoting *Rhone Poulenc Inc. v. United States*, 899 F.2d 1185, 1189 (Fed. Cir. 1990)).

Moreover, the reason for the error and consequences of failing to correct an error are important considerations in this Court's analysis. As the CAFC recognized:

> We . . . **do not agree that draconian penalties are appropriate for the making of clerical errors in order to ensure submission of proper data. Clerical errors are by their nature not errors in judgment but merely inadvertencies. While the parties must exercise care in their submissions, it is unreasonable to require perfection.** {Commerce's} refusal to consider {the respondent's} request for correction of clerical errors in this case constituted an abuse of discretion.

*Id.* at 1208-09 (emphasis added).

The facts of this case demonstrate that Commerce unlawfully declined to correct the ministerial error concerning its identification of affiliated Dingsheng entities eligible for a separate rate. By timely filing its Clerical Error Allegation on November 11, 2024, before the *Final Results* were published, Dingsheng brought the ministerial error concerning separate rate eligibility to Commerce's "attention within a reasonable time after the final determination{} . . . issued," *id.* at 1207, and within regulatory time period prescribed in 19 C.F.R. § 351.224(b) for correcting ministerial errors. Thus, if this Court decides that Commerce's mistake can be categorized as a ministerial error, there is no question that Dingsheng's request to correct the error was timely filed, and it is not a relevant factor in the Court's decision that "Dingsheng did not raise this issue in its case brief." Ministerial Error Memo at 4.

Alternatively, even if the Court decides that Commerce's separate rate decision was not a clerical error, it should reverse Commerce's decision. Here the omission of this issue from

35

Dingsheng's Case Brief can be explained by the facts that: (1) Commerce did not conduct a preliminary collapsing or separate rate analysis, which would have alerted Dingsheng to the fact that the entities granted a separate rate in AR5 differed from those identified in the AQR; and (2) the listing of Dingsheng entities inexplicably denied a separate rate in AR5 was buried at the back of the Federal Register notice. *Preliminary Results*, 88 Fed. Reg. at 35,802. These mitigating circumstances are relevant to this Court's assessment of Commerce's unwillingness to correct the error. That Dingsheng did not raise this issue in its administrative Case Brief does not bar Commerce from correcting this mistake at this time.[3]

Moreover, Commerce's failure to correct the ministerial error leads to draconian consequences, as certain Dingsheng entities were assigned the China-wide ADD rate of 105.80% rather than Dingsheng's calculated ADD rate of 60.61%. *Final Results*, 89 Fed. Reg. at 88,973-74. This massive increase in ADD liability for the Dingsheng entities not carried over from AR4 constitutes a "draconian punishment" for Commerce's inexplicable limitation of Dingsheng's AR5 separate rate to Dingsheng entities named in the AR4 decision. *NTN*, 74 F.3d at 1208. In addition, Commerce shirked its responsibility to calculate ADD margins "as accurately as possible," *id.* at 1208 (quoting *Rhone Poulenc*, 899 F.2d at 1189), since treating certain Dingsheng entities within the China-wide entity based on the mere fact that they were not

---

[3] See *Maui Pineapple Co. v. United States*, 27 CIT 580, 603 (2003) ("this Court 'shall, *where appropriate,* require the exhaustion of administrative remedies.' . . . 'Nevertheless, the Court may exercise its discretion to prevent knowingly affirming a determination with errors.' . . . In light of its decision to remand for consideration of another issue, the Court also agreed to remand for consideration of whether there was an error and for correction if necessary. . . . Rather than 'affirm a determination that might be based on a questionable record,' the Court remands this issue to Commerce to determine whether there is an error in the final margin program language. *Id.* If Commerce finds that there is an error, Commerce is directed to make the appropriate corrections.") (emphasis in original) (quoting 28 U.S.C. § 2637(d); *Torrington Co. v. United States*, 21 CIT 1079, 1082 (1997)).

identified in AR4 – without any analysis that such entities are government-controlled – results in them being assigned an ADD rate that is wildly inaccurate.

It is telling that in AR5 Commerce corrected the erroneous cash deposit instructions without court involvement. Consent Notice of Corrective Action, ECF 26; Status Report on the Corrective Action, ECF 27. This decision confirms that Commerce has the authority, and indeed an obligation, to also correct its clerical mistake of copying/pasting the Dingsheng AR4 entities into its separate rate list for AR5. Both of these mistakes involved a "clerical error resulting from inaccurate copying" by Commerce in AR5. 19 C.F.R. § 351.224(f). Dingsheng asked that Commerce correct both errors "within a reasonable time after the final determination{}" – *i.e.*, Dingsheng's Clerical Error Allegation was raised before the *Final Results* published and its Request for Instruction Correction was filed within three months of those instructions issuing, after the *Final Results* published. The instruction inversion was harsh in that it resulted in unfair cash deposit collection that deprived Dingsheng of its hard-earned competitive advantage over Zhongji. The separate rate denial was draconian because it arbitrarily required liquidation of the Dingsheng AR5 entries at an ADD rate 45 percentage points higher than Dingsheng's AR5 rate calculated based on Dingsheng data.

In short, Commence unlawfully declined to correct the Dingsheng separate rate identification in AR5 to align with Dingsheng's AQR – instead erroneously carrying over the names of AR4 entities. This agency action was not "rational{}," constituting an abuse of discretion as it "represents an unreasonable judgment in weighing relevant factors." *Star Fruits*, 393 F.3d at 1281; *Consolidated Fibers*, 32 CIT at 36. Such arbitrariness is underscored through juxtaposition with the similar, albeit less drastic clerical error resulting in incorrect cash deposit instructions, which Commerce corrected without the need for judicial action. Commerce did not,

and cannot, explain why it accepted one timely filed request to correct a clerical error but not the other that resulted in draconian consequences of substantially greater and inaccurate ADD liability. In AR5, Commerce has not provided any justification at all, let alone the requisite {}sufficient reasons for treating similar situations differently." *SKF I*, 263 F.3d at 1382. As such, this Court should order remand for Commerce to reconsider its denial of Dingsheng's Clerical Error Allegation.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this Court remand for Commerce to reconsider its *Final Results*.

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

</div>

Dated:  October 8, 2025                          *Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law in Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 11,258 words, less than the 14,000 word limit.

<u>/s/ Dharmendra N. Choudhary</u>
Dharmendra N. Choudhary

*Counsel for Plaintiffs*

Dated: October 8, 2025

15015662_3

Attachment

**Dingsheng**
**Analysis of by-product recycled aluminum**

| Description | | Jiangsu Dingsheng | | Liansheng | Five star | Teemful | Dingheng Thailand | |
|---|---|---|---|---|---|---|---|---|
| Quantity produced (Ton) | [ | | | | | | | ] |
| Quantity sold (Ton) | [ | | | | | | | ] |
| Quantity reintroduced into production (Ton) | [ | | | | | | | ] |

*Source: Ex.D-10.1 to D-10.4*

*Analysis:*

| | | **Total** | | Formula |
|---|---|---|---|---|
| Quantity produced (Ton) | [ | | ] | A |
| Quantity sold (Ton) | [ | | ] | B |
| % of sales | [ | | ] | C=B/A |
| % of re-introduced | [ | | ] | D=1-C |

Case Name: Aluminum Foil From People Republic of China     POR: April 2022 - March 2023
Company Name: Jiangsu Dingsheng
Case Number: A-570-053

Special Instructions:  Prepare separate charts for each by-product or co-product.

By-Product/Co-Product:  Recycled aluminum (Ton)

| | | 202204 | 202205 | 202206 | 202207 | 202208 | 202209 | 202210 | 202211 | 202212 | 202301 | 202302 | 202303 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity stock-into warehouse (A) | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-20A |
| Ending balance (B) | [ | | | | | | | | | | | | | | ] |
| Beginning balance (C) | [ | | | | | | | | | | | | | | ] |
| Quantity produced (D=A+B-C) | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-21.2 |
| 1) Quantity Produced from produciton of aluminum foil | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-20A |
| Cold rolling workshop | [ | | | | | | | | | | | | | | ] |
| Foil rolling workshop | [ | | | | | | | | | | | | | | ] |
| Battery foil workshop | [ | | | | | | | | | | | | | | ] |
| Coating, carbon coated, color foil and oxidation workshop (produced non-subject only) | [ | | | | | | | | | | | | | | ] |
| 2) Quantity Produced from production of aluminum core | [ | | | | | | | | | | | | | | ] |
| Quantity Purchased | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-6 |
| Quantity Sold | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-20A |
| Quantity Reintroduced into Production | [ | | | | | | | | | | | | | | ] Recon.to Ex.D-20A&21.2 |

By-Product/Co-Product:  Aluminum Ash & Aluminum Dross (Ton)

| | | | 202204 | 202205 | 202206 | 202207 | 202208 | 202209 | 202210 | 202211 | 202212 | 202301 | 202302 | 202303 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Produced | [ | | | | | | | | | | | | | | | ] Recon.to Ex.D-20A&21.2 |
| Beginning balance | | | | | | | | | | | | | | | | ] |
| Ending balance | | | | | | | | | | | | | | | | ] |
| Quantity Sold | | | | | | | | | | | | | | | | ] Recon.to Ex.D-20A |

**Tab 3 - Ex. D-10.2**

| | |
|---|---|
| Case Name: | Aluminum Foil From People Republic of China |
| Company Name: | Teemful & Five Star |
| Case Number: | A-570-053 |

POI/POR:    Apr-2022 to Mar-2023

Special Instructions:  Prepare separate charts for each by-product or co-product

Teemful

By-Product/Co-Product:  RECYCLEDAL (By-product Recycled Aluminum)

| | Unit | | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | POR Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Beginning of Period | TON | [ | | | | | | | | | | | | | ] |
| Stock-in: Quantity Produced | TON | [ | | | | | | | | | | | | | ] |
| Stock-in: Quantity Goods-in | TON | [ | | | | | | | | | | | | | ] |
| Stock-out: Total Goods-out | TON | [ | | | | | | | | | | | | | ] |
| in which: Quantity Sold (Invoice is issued) | TON | [ | | | | | | | | | | | | | ] |
| Quantity Ending of Period | TON | [ | | | | | | | | | | | | | ] |

Five Star

By-Product/Co-Product:  RECYCLEDAL (By-product Recycled Aluminum)

| | Unit | | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | POR Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Beginning of Period | TON | [ | | | | | | | | | | | | | ] |
| Stock-in: Quantity Produced | TON | [ | | | | | | | | | | | | | ] |
| Stock-in: Quantity Goods-in | TON | [ | | | | | | | | | | | | | ] |
| Stock-out: Total Goods-out | TON | [ | | | | | | | | | | | | | ] |
| in which: Quantity Sold (Invoice is issued) | TON | [ | | | | | | | | | | | | | ] |
| Quantity Ending of Period | TON | [ | | | | | | | | | | | | | ] |

Teemful & Five Star

| | | |
|---|---|---|
| Of Which: Quantity Produced (Teemful & FiveStar) | [ | ] |

| | | |
|---|---|---|
| Case Name: | Aluminum Foil From People Republic of China | POR: April 2022 - March 2023 |
| Company Name: | Liansheng | |
| Case Number: | A-570-053 | |

Special Instructions:  Prepare separate charts for each by-product or co-product.

| By-Product/Co-Product:  RECYCLEDAL (By-product Recycled Aluminum) | Unit | | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | POR Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Produced | TON | [ | | | | | | | | | | | | | ] |
| Quantity Purchased | TON | [ | | | | | | | | | | | | | ] |
| Quantity Goods-out | TON | [ | | | | | | | | | | | | | ] |
| in which: Quantity Sold (QTY and Month based on invoice) | TON | [ | | | | | | | | | | | | | ] |
| Quantity Delivered to Toller (Huolingol Tengxin Aluminum Co., Ltd.) for producing Al iron alloy | TON | [ | | | | | | | | | | | | | ] |
| Quantity Reintroduced into Production - Cast Rolling Workshop | TON | [ | | | | | | | | | | | | | ] |
| Quantity Reintroduced into Production - Self-Produced Al Core | TON | [ | | | | | | | | | | | | | ] |

| By-Product/Co-Product:  ALASHDROSS (Aluminum Ash & Aluminum Dross) | Unit | | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | POR Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Produced | TON | [ | | | | | | | | | | | | | ] |
| Quantity Delivered to Toller (Xinghua Yongtai New Materials Co., Ltd.) for producing Al ingot | TON | [ | | | | | | | | | | | | | ] |

Case Name:            Aluminum Foil From People Republic of China        POR: April 2022 - March 2023
Company Name:         Dingheng,Thailand
Case Number:          A-570-053

Special Instructions:  Prepare separate charts for each by-product or co-product.

| By-Product/Co-Product:  RECYCLEDAL (By-product Recycled Aluminum) | Unit | | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 | Jan-23 | Feb-23 | Mar-23 | POR Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity Produced(Total) | TON | [ | | | | | | | | | | | | | | ] |
| Quantity Produced(during the production of aluminum foil) | TON | [ | | | | | | | | | | | | | | ] |
| Quantity Purchased | TON | [ | | | | | | | | | | | | | | ] |
| Quantity Sold | TON | [ | | | | | | | | | | | | | | ] |
| Quantity Reintroduced into Production | TON | [ | | | | | | | | | | | | | | ] |